**Kathi COOPER, Beth Harrington, and Matthew Hillesheim, Individually and on Behalf of All Those Similarly Situated, Plaintiffs,**

v.

**The IBM PERSONAL PENSION PLAN and IBM Corporation, Defendants.**

**No. CIV. 99–829–GPM.**

United States District Court, S.D. Illinois.

July 31, 2003.

Steven A. Katz, Douglas R. Sprong, Korein Tillery, Swansea, IL, Robert F. Hill, John H. Evans, Hill & Robbins, William K. Carr, Law Offices of William K. Carr, Denver, CO, for Plaintiffs.

Jeffrey G. Huvelle, Robert D. Wick, Covington & Burling, Washington, DC,

Frederick J. Hess, Lewis, Rice et al., Belleville, IL, for Defendants.

## MEMORANDUM AND ORDER

### MURPHY, Chief Judge:

The Cooper class challenges IBM's pension plan ("Plan") as violative of the age discrimination prohibitions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. All pending motions are listed in the appendix to this Memorandum and Order. (*See* Appendix A.)

### I. *Factual Background*

Plaintiff Cooper has been a Plan participant since May 21, 1979, the day she began her employment with IBM. Plaintiff Harrington was a Plan participant from 1990 to August 2000, when she terminated her employment with IBM. Towards the end of Harrington's employment, her pension benefits accrued pursuant to a Plan amendment made effective July 1, 1999. Plaintiff Hillesheim began employment with IBM in 1996 and terminated his employment in March 2000. He is a Plan participant, but because he was employed for fewer than five years, the benefits he accrued under the Plan did not vest.

### IBM PLAN AMENDMENTS

The IBM Plan is a defined benefit pension plan[1] that provides benefits for IBM employees. Since 1995, the Plan has been amended twice. The changes created by these amendments are the basis of Plaintiffs' lawsuit.

### A. *The January 1, 1995 Amendment*

Before 1995, the IBM Plan provided benefits in the form of a lifetime annuity and a cash balance accumulation. On January 1, 1995, IBM's Board of Directors enacted an amendment to the Plan which adopted a plan design known as a pension equity plan. IBM coined its new design the Pension Credit Formula ("PCF").

PCF participants accrue a normal retirement benefit payable in the form of a life annuity commencing at age 65. Each year, a participant earns a specific number of "base points," which is determined by the employee's age in the year worked. Additionally, a participant can earn "excess points" if his or her five year average earnings are above social security compensation. Under this framework, however, a participant is permitted to accumulate no more than 425 base points and 75 excess points.

A participant's base points and excess points are applied to a five step formula to determine the monthly retirement benefit at age 65. Under this formula, a participant's base points are added, divided by 100, and multiplied by the average of his or her highest consecutive five year earnings. Then, after accounting for the participant's excess points, that number is divided by a "benefit conversion factor."

The class claims that the PCF violates ERISA because it is age discriminatory. This claim is based on the PCF's benefit conversion factor which increases in direct correlation to an employee's age. According to the class, this increase causes an older employee to receive a lower rate of benefit accrual and to have a smaller accrued benefit at age 65 than a younger employee, despite having worked the same number of years at the same salary as the younger employee.

### B. *The July 1, 1999 Amendment*

Effective July 1, 1999, IBM again amended its Plan to create its Cash Bal-

---

**1.** Under a conventional defined benefit plan, an employee is credited with a specific percentage of his or her salary for each year of employment. *See Esden v. Bank of Boston,* 229 F.3d 154, 158 n. 4 (2nd Cir.2000). This differs from a defined contribution plan in which funds are actually deposited into an employee's account.

ance Formula ("CBF"). Under the CBF, a participant's benefit is determined by reference to a hypothetical account known as a Personal Pension Account ("PPA"). Every month, a participant's PPA accumulates "pay credits" at a rate of 5% of the employee's salary and "interest credits" at a rate one percentage point higher than the rate of return on one year treasury securities. When a participant's employment with IBM ends, he may withdraw his account balance as a lump sum, convert the account balance into an immediate life annuity, or defer the receipt of a lump sum payment or a life annuity until a later date. While a former employee is unable to earn additional pay credits, he continues to accumulate interest credits until his PPA balance is withdrawn or converted into a life annuity.

The class alleges that the CBF also violates ERISA's laws against age discrimination. This claim is based on how interest credits accrue on a participant's PPA balance until he reaches normal retirement age.

## II. *Standard of Review*

All but one of the motions before the Court are motions for summary judgment. The standard applied to summary judgment motions filed under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the non-

movant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial. The evidence must create more than some metaphysical doubt as to the material facts. A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee,* 246 F.3d 927, 931–32 (7th Cir.2001) (internal citations and quotations omitted).

## III. *Analysis*

The Court's analysis will be divided into two sections: (1) all motions related to IBM's 1995 Pension Credit Formula; and (2) all motions related to IBM's 1999 Cash Balance Formula.

### 1995 PENSION CREDIT FORMULA

The class alleges that the terms of the IBM Plan, as amended January 1, 1995, violate ERISA § 204(b)(1)(G) & (H). Specifically, the class claims that under the PCF, benefits are reduced on account of *increases in age or service* in violation of § 204(b)(1)(G) and that the benefits accrue at a *rate which is reduced because of age or the attainment of any age* in violation of § 204(b)(1)(H). The class seeks to have Plan benefits determined in a manner consistent with these ERISA provisions and to enjoin IBM from continuing these violations.

■ Defendants move to dismiss the § 204(b)(1)(H) claim on the grounds that the ERISA age discrimination provisions apply only to employees who have reached normal retirement age (age 65), arguing that the younger Plaintiffs lack standing to sue. Defendants are wrong.

ERISA § 502(a) provides that "[a] civil action may be brought ... (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a). The plain language of this provision confers statutory standing to plan participants, such as the named Plaintiffs, who seek to protect their employee benefit rights. Because Congress is entitled to enact statutes which create standing where it would otherwise not exist, *see Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990), Defendants' motion to dismiss (Doc. 103) is denied.

## A. § 204(b)(1)(G) Claim

Cooper filed a motion for partial summary judgment (Doc. 87) on July 18, 2002, seeking, in part, a determination that the PCF violates the age discrimination provision of ERISA § 204(b)(1)(G) because the amount of an employee's accrued benefit under the Plan decreases on account of the employee's age. Defendants have likewise filed a motion for summary judgment on the § 204(b)(1)(G) claim, arguing that no participant in the IBM Plan has ever experienced a reduction in his or her accrued benefit on account of an increase in age or service and, therefore, the named Plaintiffs lack standing to assert this claim.

Section 204(b)(1)(G) has been part of ERISA since its inception in 1974 and provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if the participant's accrued benefit is reduced on account of any increase in his age or service." 29 U.S.C. § 1054(b)(1)(G). In the context of a defined benefit plan, such as the IBM Plan, the term "accrued benefit" means " 'the individual's accrued benefit deter-

mined under the plan and ... *expressed in the form of an annual benefit commencing at normal retirement age.*' " 29 U.S.C. § 1002(23)(A). "Normal retirement age" is 65. *See* 29 U.S.C. § 1002(24); *see also Esden v. Bank of Boston*, 229 F.3d 154, 162 (2nd Cir.2000).

The PCF adopted by IBM in the January 1, 1995, amendment to its Plan violates ERISA. The following examples illustrate the violation.

A participant's retirement benefit is computed under the PCF by a five step formula: (1) the total number of base points earned at that time, up to a maximum of 425, are added and then divided by 100; (2) the number from the first step is multiplied by the average of the employee's highest consecutive five year earnings to determine what the Plan denominates as the "Base Point Benefit Value at Normal Retirement Age;" (3) if the employee's five year average earnings exceed social security compensation, the excess points earned are similarly added, up to a maximum of 75, divided by 100, and then multiplied by the dollar amount by which the employee's five year average exceeds social security compensation, to determine the employee's "Excess Point Benefit Value at Normal Retirement Age;" (4) the employee's Base Point Benefit Value at Normal Retirement Age and any Excess Point Benefit Value at Normal Retirement Age are added together to yield the employee's "Pension Credit Value at Normal Retirement Age;" and (5) this Pension Credit Value is then divided by a "Benefit Conversion Factor" specified in the Plan. The result is the dollar amount of the employee's annual annuity commencing at age 65, which can be divided by twelve to determine the monthly annuity.

Suppose an employee begins working for IBM at age 35 and earns an annual salary of $60,000.00 until his employment ends at

age 50. During this fifteen year period, he will accumulate 215 base points. *See* App. B. After dividing by 100, and multiplying by $60,000.00, the employee is assigned a "Base Point Benefit Value at Normal Retirement Age" of $129,000.00. Because termination occurs when this employee is 50 years old, his benefit conversion factor (which is divided into his $129,000.00 base point value) is 8.537. *See* App. C. Therefore, his age 65 accrued benefit is equal to **$15,110.69 per year or $1,259.22 per month**.

Now, change only the age—our hypothetical employee starts his employment with IBM at age 50 instead of age 35. This employee will accumulate more base points than his younger counterpart; a total of 240. *See* App. B. After dividing by 100, and multiplying by $60,000.00, he is assigned a higher "Base Point Benefit Value at Normal Retirement Age" of $144,000.00. However, this 65 year old employee is also assigned a higher benefit conversion factor equal to 10.918. *See* App. C. After his $144,000.00 base point value is reduced by this conversion factor, he is left with an age 65 accrued benefit equal to only **$13,189.23 per year or $1,099.10 per month**.

Finally, consider an employee who begins working at age 25 and earns $60,000.00 each year until he retires at age 65. By age 58, this employee has 423 base points and a benefit conversion factor of 10.543. *See* Apps. B & C. Applying the PCF's five step analysis, he has an age 65 accrued benefit of **$24,072.84 per year or $2,006.07 per month**. For an additional year of service, this same employee will receive only two (as opposed to sixteen) base points because he will have reached the 425 point cap. Notwithstanding, the employee's benefit conversion factor continues to rise to 10.596. *See* App. C. After applying the IBM formula, his age 65 accrued benefit has *decreased* to **$24,065.69

or $2,005.47 per month**. Each additional year he works, this employee will accumulate zero base points because of the cap. Still, as his years of service continue to increase, so does the benefit conversion factor. By age 65, this employee's benefit conversion factor will be 10.918. *See* App. C. Under the PCF, this will yield an accrued benefit of only **$23,355.93 or $1,946.00 per month**.

The benefit conversion factor contained in the PCF reduces a participant's accrued benefit solely on increases in age or service. Accordingly, the 1995 PCF violates ERISA § 204(b)(1)(G). *See* 29 U.S.C. § 1054(b)(1)(G). Defendants' argument that no specific employee has actually suffered a reduction in his or her accrued benefit is rejected because it relates to damages as opposed to liability and because Congress has conferred statutory standing to all "participants" in an ERISA plan. *See* 29 U.S.C. § 1132(a)(3). Plaintiffs' motion for partial summary judgment on Count I (Doc. 87) is granted, and Defendants' motion for partial summary judgment on Count I (Doc. 105) is denied.

**B. § 204(b)(1)(H)**

██ Cooper's motion for partial summary judgment on Count I also seeks a determination that the PCF in the 1995 IBM Plan violates ERISA § 204(b)(1)(H) because the rate of an employee's benefit accrual under the Plan decreases on account of the employee's age. Defendants have also filed a motion for summary judgment on the § 204(b)(1)(H) claim.

Section 204(b)(1)(H) was enacted as part of the Omnibus Budget Reduction Act of 1986 and provides that "a defined benefit plan shall be treated as not satisfying the requirements of this paragraph if, under the plan, an employee's benefit accrual is ceased, or the rate of an employee's benefit accrual is reduced, because of the at-

tainment of any age." 29 U.S.C. § 1054(b)(1)(H).

■ Under the PCF, the rate of accrual of an employee's *immediately-payable* benefit steadily increases with age. However, the PCF can result in a decrease in the rate at which an employee's *age 65 annuity* accrues. Therefore, it is important whether § 204(b)(1)(H)'s term "rate of benefit accrual" refers to the rate at which an employee accrues a benefit payable in the form of an annuity that commences at age 65, or if an employee's "rate of benefit accrual" may be measured by reference to an immediate annuity.

ERISA does not explicitly answer this question. However, the term "accrued benefit" which appears in § 204(b)(1)(G) refers to an employee's accrued benefit "expressed in the form of an annual benefit commencing at normal retirement age." *See* 29 U.S.C. § 1002(23)(A); *see also Esden*, 229 F.3d at 163. Defendants argue that § 204(b)(1)(H)'s phrase "rate of benefit accrual" should not be expressed in the form of an age 65 benefit and that the term *benefit accrual* means something different than the term *accrued benefit*.

This argument is based on the actuarial premise "time value of money." According to Defendants, it is economically nonsensical to compare a 25 year old employee's rate of benefit accrual with a 64 year old employee's rate of benefit accrual by reference to the age 65 benefit that each has accumulated, because the 64 year old employee is set to receive his benefit much sooner. Accordingly, § 204(b)(1)(H)'s phrase "rate of benefit accrual" should be interpreted to refer to benefits payable immediately upon termination of employment.

From an economist's perspective, Defendants have a good argument. A dollar today is worth more than the promise of a dollar a year from now. This does not mean, however, that the PCF is legal.

ERISA creates specific rules relating to defined benefit plans. It is clear that a participant's accrued benefit, as it appears in § 204(b)(1)(G), must be measured by reference to the amount of an employee's annual benefit at age 65. *See* 29 U.S.C. § 1002(23)(A); *see also Esden*, 229 F.3d at 163. The language at issue—"rate of benefit accrual"—is found in the very next subchapter, § 204(b)(1)(H). The best interpretation of this phrase is that it also refers to an employee's age 65 annual benefit and the rate at which that age 65 annual benefit accrues.

Defendants question why Congress would use different language in succeeding subparagraphs (accrued benefit and benefit accrual) unless it intended the subparagraphs to cover different types of benefits. The answer is simple. Congress chose to be grammatically correct. The term accrued benefit in § 204(b)(1)(G) means an employee's age 65 *accumulated benefit*. If Congress had used the term accumulated benefit in § 204(b)(1)(G), instead of the term accrued benefit, it would not have used the clumsy phrase "rate of accumulated benefit" in § 204(b)(1)(H). Presumably, Congress would have opted for standard English and used the phrase "rate of benefit accumulation," even though it intended to cover the same type of benefit in both subparagraphs.[2]

Congress intended § 204(b)(1)(H) to cover the rate at which a participant's age 65 benefit accrues under a defined benefit plan. So, is the rate of a participant's

---

**2.** For a simpler example, consider the word popcorn. Popcorn is the word used to describe the product created by exposing corn kernels to extreme heat. If asked to draft a phrase related to the speed of this process, one would not say "rate of popcorn." Rather, to be grammatically correct, one would say "the rate corn pops."

benefit accrual under the PCF reduced because of the participant's age? The answer is yes, as illustrated by the previous hypotheticals.

A participant who works at IBM from age 35 to age 50 earning a salary of $60,000.00 will accrue an age 65 annual benefit under the PCF of **$15,110.69**. On the other hand, an employee who works for IBM from age 50 to age 65, also earning an annual salary of $60,000.00, will accrue an age 65 annual benefit under the PCF of only **$13,189.23**. To determine the "rate of benefit accrual" for these hypothetical employees, their age 65 annuity is divided by the product of their average compensation ($60,000.00) and years of service (15). *See* Doc. 88, App. C, p. 11. Thus, the 50 year old employee accrues an age 65 annual benefit at a rate of **1.68%**.[3] In contrast, the 65 year old employee accrues an age 65 annual benefit at a rate of only **1.47%**.[4]

The decrease in rate of age 65 annual benefit accrual is also demonstrated by reference to the sharp yearly reduction in percentage that occurs to employees who have reached the 425 base point cap under the PCF. As previously noted, an employee who begins working for IBM at age 25 will reach the 425 base point maximum between ages 58 and 59. At age 59, after 35 years of service, he has accrued an age 65 annual benefit of $24,065.69[5] under the PCF. Therefore, his rate of benefit accrual is **1.15%**.[6] At age 60, with an annual benefit of $23,945.91, his rate of benefit accrual drops to **1.11%**.[7] This employee's rate of benefit accrual continues to decrease each year, leaving him with a rate of **0.95%**[8] by age 65.

These examples illustrate that under the PCF, a participant's rate of benefit accrual decreases because of the attainment of a certain age. For this reason, the PCF violates ERISA § 204(b)(1)(H). Plaintiffs' motion for partial summary judgment on Count I (Doc. 87) is granted, and Defendants' motion for partial summary judgment on Count I (Doc. 130) is denied.

### C. § 204(b)(1)(A)(B) & (C) (Anti-backloading)

 The class also claims that, effective January 1, 1995, benefits accruing under the terms of the IBM Plan do not satisfy any of the three "anti-backloading" rules found in subparagraphs (A), (B), or (C) of ERISA § 204(b)(1). *See* 29 U.S.C. § 1054(b)(1). Defendants seek summary judgment on this claim. Defendants cannot comply with either the 3% rule or the 133⅓% rule and must comply with the anti-backloading rules, if at all, by satisfying the fractional rule of § 204(b)(a)(C).

---

**3.** $15,110.68/($60,000.00 × 15).

**4.** $13,189.23/($60,000.00 × 15).

**5.** This employee has accumulated 425 base points and has a benefit conversion factor of 10.596. *See* Apps. B and C. Because his highest five year average salary is $60,000.00, the PCF would be applied as follows:
(425/100) = 4.25 4.25 × $60,000.00 = $255,000.00 $255,000.00/10.596 = $24,065.69.

**6.** Again, rate of benefit accrual is calculated by dividing an employee's age 65 annual benefit by (years of service × average compensation):
$24,065.69/(35 × $60,000.00) or $24,065.69/($2,100,000.00) = 1.15%.

**7.**
$23,945.91/(36 × $60,000.00) or $23,945.91/($2,160,000.00) = 1.11%.

**8.**
$23,355.93/(41 × $60,000.00) or $23,355.93/(2,460,000.00) = 0.95%.

The issue is whether the Plan's PCF satisfies subparagraph (C) during its "phase-in" period from January 1, 1995 (the date of the PCF's enactment) to December 31, 1999.

ERISA § 204(b)(1)(C) states:

[a] defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which any participant is entitled upon his separation from the service is not less than a fraction of the annual benefit commencing at normal retirement age to which he would be entitled under the plan as in effect on the date of his separation if he continued to earn annually until normal retirement age the same rate of compensation upon which his normal retirement benefit would be computed under the plan, determined as if he had attained normal retirement age on the date any such determination is made (but taking into account no more than the 10 years of service immediately preceding his separation from service). Such fraction shall be a fraction, not exceeding 1, the numerator of which is the total number of his years of participation in the plan (as of the date of his separation from the service) and the denominator of which is the total number of years he would have participated in the plan if he separated from the service at the normal retirement age. For purposes of this subparagraph, social security benefits and all other relevant factors used to compute benefits shall be treated as remaining constant as of the current year for all years after such current year.

29 U.S.C. § 1054(b)(1)(C).

A 40 year old employee starts working for IBM on January 1, 1995, with an annual salary of $60,000.00 and quits one year later. His accrued annual benefit is $311.80.[9] To satisfy § 204(b)(1)(C), his "fractional rule benefit" (the age 65 annual accrued benefit to which he would be entitled under the PCF if he continued to earn $60,000.00 annually until he attained age 65, multiplied by the applicable fraction) must be less than or equal to $311.80. His annual accrued benefit is **$21,707.27**[10] if he continues working until age 65. The fraction used to reduce this amount is 1/25.[11] Thus, his fractional rule benefit is **$868.29**,[12] an amount greater than the benefit accrued on the date he stopped working for IBM. This violation continues until

---

**9.** Under the terms of the IBM Plan, the PCF uses compensation averaged over a five year period. However, compensation earned before 1995 cannot be used in this average. Therefore, from January 1, 1995, to December 31, 1999, a participant's average compensation is determined by adding together his total compensation and dividing by five. In the hypothetical above, the employee earning $60,000.00 per year has an average compensation of only $12,000.00 after his first year of service. The employee accumulated 15 base points and has a conversion factor of 5.773. *See* Apps. B & C. Using these figures, the analysis under the PCF is as follows:

(15/100) = .15 .15 × $12,000.00 = $1,800.00 $1,800.00/5.773 = <u>$311.80</u>.

**10.** This employee would accumulate 395 base points and would have a conversion factor of 10.918 if he continues working until age 65. *See* Apps B and C. Because under § 204(b)(1)(C) it is presumed that he continues earning $60,000.00 until age 65, the PCF would be applied as follows:

(395/100) = 3.95 3.95 × $60,000.00 = $237,000.00 $237,000.00/10.918 = <u>$21,707.27</u>.

**11.**

Total # of years of participation in the plan (as of date of separation from service)

---

Total # of years he would have participated in the plan if he separated from the service at the normal retirement age.

**12.** $21,707.27 × (1/25) = $868.29.

the fourth year (1998) of the PCF's "phase-in" period.[13]

■ But Defendants argue that § 204(b)(1)(C)'s language "as if he had attained normal retirement age on the date any such determination is made" should be interpreted to mean that the fractional rule benefit should be calculated as though the employee turned age 65 on the date his service ended. This is wrong.[14] Section 204(b)(1)(C) provides that the fractional rule benefit is the "annual benefit commencing at normal retirement age to which [an employee] would be entitled ... if he *continued to earn annually until normal retirement age* the same rate of compensation upon which his normal retirement benefit would be computed under the plan." (emphasis added). The words *continued to earn annually until normal retirement age* means that the employee's benefit must be calculated as though he remained employed until age 65.

Moreover, if Defendants' interpretation is correct, § 204(b)(1)(C) is rendered meaningless. The 40 year old hypothetical employee used in the last example would have a fractional rule benefit of $7.03[15] at the end of his first year of employment as Defendants apply the statute. Congress did not intend § 204(b)(1)(C) to invalidate only those plans that produce less than

13.

*1996:*

| | | |
|---|---|---|
| Benefit on date of separation | = $1,187.73 | [(30/100 × $24,000.00)/6.062] |
| Fractional rule benefit | = $1,736.58 | ($21,707.27 × 2/25) |

*1997:*

| | | |
|---|---|---|
| Benefit on date of separation | = $2,545.17 | [(45/100 × $36,000.00)/6.365] |
| Fractional rule benefit | = $2,604.87 | (21,707.27 × 3/25) |

*1998:*

| | | |
|---|---|---|
| Benefit on date of separation | = $4,309.44 | [(60/100 × $48,000.00)/6.683] |
| Fractional rule benefit | = $3,473.12 | (21,707.27 × 4/25) |

14. For the reasons that follow in the text of this Order, § 204(b)(1)(C), when read as a whole, does not call for a fractional rule benefit calculated as though an employee turned age 65 on the date his service ended. The Court reads the phrase "as if he had attained normal retirement age on the date any such determination is made" as referring solely to an employee's rate of compensation, and is included to ensure that the salary that an employee is earning when his service ends is used as the employee's salary at age 65 when his fractional rule benefit is determined.

15. If the employee retired in 1996, after working only one year, he would be treated as having turned age 65 in 1996 for fractional rule purposes if Defendants have correctly interpreted § 204(b)(1)(G). Therefore, he would have accumulated 16 base points during this year of employment and would have a conversion factor of 10.918 under the PCF. *See* Apps. B and C. Thus, his fractional rule benefit would be calculated as follows:

(16/100) = .16 .16 × $12,000.00 = $1,920.00 $1,920.00/10.918 = $175.86
$175.86 × 1/25 = $7.03

In determining the applicable fraction, the Court uses a denominator that is determined by subtracting the employee's age when participation in the Plan began from age 65. Defendants may assume that based on their theory—a fractional rule benefit is calculated as though an employee turned age 65 on the date his service ended—the denominator in the applicable fractions should be determined by counting to age 65 as though the employee reached such age on the date employment was terminated. This assumption is unsupportable. If the applicable fraction used a denominator that counted forward only to the date that an employee's service ended, the fraction would always be one, a result that cannot be supported by § 204(b)(1)(C)'s language. To illustrate that the fraction would always be one (and thus there would be no reason for § 204(b)(1)(C) to instruct the usage of a fraction), again consider the hypothetical forty year old. If his service ends in 1998, the numerator will be three (number of years of participation in the Plan). The denominator would also be three because, by treating the employee as if he turned 65 at termination, there are no more years to add by assuming the employee continued working to normal retirement age.

$7.03 in pension benefits for a 40 year old employee earning $60,000.00.

Defendants argue that it is unfair to compare a partially phased in benefit with a fully phased in fractional rule benefit. But this is exactly the situation that § 204 is intended to cover. *See Jones v. UOP*, 16 F.3d 141, 144–45 (7th Cir.1999). The PCF directs that a first year participant's salary be divided by five and accordingly that participant's benefits are "backloaded," *i.e.*, five years of employment are required before the participant can ratably accrue pension benefits. Defendants' motion for summary judgment on the § 204(b)(1)(C) claim (Doc. 128) is denied.

*THE CASH BALANCE PLAN*

The 1995 PCF was intended to provide a rapid build up of plan value for young and mid-career hires while reducing generous early retirement subsidies. The PCF worked well, and by 1998 IBM had over 20,000 employees between 35 and 55 years of age who had fewer than five years of service. So, in 1998 IBM faced rising pension costs and diminishing pension income as a result of the benefits the company would be paying to their middle aged employees. But, the Plan was not strapped for cash, as there was a surplus of $8 billion at the close of 1997, and the Plan's assets were generating a return greater than what was required to cover the annual costs of providing benefits. Although IBM had not contributed to the Plan for several years, in 1997, 7% of IBM's total reported net earnings was pension income in the amount of $420 million.

In 1999 IBM again amended the Plan and opted for a "cash balance formula" whereby a participant's benefit is determined by reference to a hypothetical account. The Plan's actuaries projected that this CBF would produce annual savings of almost $500 million by 2009. These savings would result from reductions of up to 47% in future benefits that would be earned by older IBM employees.

IBM was aware of the age discrimination issues that would come with the new CBF. Indeed, the Plan's actuaries projected the age 65 annuity benefit earned by a younger employee for a year of service exceeded the benefit earned by an older employee for the same service. And, the actuaries calculated that the amount of an age 65 annuity earned each year by an employee under the CBF decreased as the employee aged. Nevertheless, the new CBF went into effect July 1, 1999. Due to negative reaction from employees, the Plan was amended a second time in September 1999 to permit more employees to choose between being covered by the new formula or the previous formula.

The CBF had its intended effect. Plan income increased from $395 million in 1998 to $638 million in 1999. Astonishingly, Plan income was over $1 billion in 2001, and this accounted for 13% of IBM's overall net income.

The parties agree that the 1999 Plan as amended is a defined benefit plan. Therefore, the Plan must comply with the many and complex statutory strictures that apply to all defined benefit plans. IBM presents startling anomalies and absurdities that result from pushing the logic that Plaintiffs develop in their argument. But these anomalies and absurdities occur only because the CBF doesn't work within the longstanding statutory framework regarding defined benefit plans. The 1999 Plan looks like a defined contribution plan trying to pass for a defined benefit plan. It doesn't make the cut.

Before testing the CBF under ERISA § 204(b)(1)(H), it is helpful to compare the two types of pension plans authorized by ERISA. A defined contribution plan is easy to describe and understand. The sponsoring employer contributes a speci-

fied amount into a separate account for each employee. The risks and rewards of the investment are borne by the employee. The employer does not guarantee a particular result and is off the hook. However, there is no opportunity for the employer to earn pension income or reduce the real costs of the contributions specified in the plan. In this type of plan, the sponsoring employer's performance is measured by what it puts into the plan. A defined benefit plan is a different creature. The sponsoring employer promises a certain result based upon a formula specified in the plan. The employer must deliver on the promise irrespective of how the funds set aside for this purpose fare in the financial markets. Here, the employer is literally on the hook but has the opportunity to earn pension income and reduce the real costs of funding a pension for employees. In this type of plan, the sponsoring employer's performance is measured by what comes out of the plan in terms of benefits.

### A. Section 204(b)(1)(H)

■ The CBF adopted by the 1999 amendment to the Plan creates a hypothetical account referred to as a personal pension account ("PPA") for each participant. Benefits accrue by the addition of "pay credits" and "interest credits" made to the participant's PPA. Future interest payments are guaranteed by the Plan irrespective of a participant's continued employment with IBM.

It is settled that a cash balance plan such as the IBM Plan is held to the same requirements regarding vesting and accrual of benefits as any defined benefit plan. *Esden*, 229 F.3d at 162–63. For each year of qualifying service, such a plan must provide for a definitely determinable, nonforfeitable, "accrued benefit." ERISA § 203(a). The accrued benefit must be expressed in the form of an annual benefit commencing at normal retirement age. 29 U.S.C. § 1002(23). Moreover, the interest

credits that are projected and valued as an age 65 annuity must also be taken into account in determining whether a cash balance plan complies with the benefit accrual requirements under ERISA § 204(b)(1). *Esden*, 229 F.3d at 166, n. 18. This is where the CBF runs afoul of ERISA's age discrimination proscriptions.

Interest credits are a part of the accrued benefit specified in IBM's 1999 Plan, and these count in determining whether the benefit accrual requirements of § 204(b)(1) are met. And, like in any defined plan, the interest credits must be valued as an age 65 annuity. At this point in the analysis, the result is inevitable. In terms of an age 65 annuity, the interest credits will always be more valuable for a younger employee as opposed to an older employee. A noted pension expert summarized matters:

> There is no dispute about the underlying arithmetic of cash balance arrangements: each year, as a cash balance participant ages, the same contribution made for her in the previous year declines in value in annuity terms. Moreover, cash balance arrangements are defined benefit plans and, therefore, measure accrued benefits in terms of annuities, not in terms of the contributions themselves.

Edward A. Zelinsky, *The Cash Balance Controversy*, 19 Virginia Tax Rev. 4, 733 (Spring 2000).

The 1999 CBF violates the literal terms of ERISA § 204(b)(1)(H). IBM's own age discrimination analysis illustrates the problem: a 49 year old employee with 20 years of service accrues an age 65 annuity of $8,093 in the year 2000. The following year, he accrues an additional $622, and by 2010, his additional annual accrual is only $282. This 49 year old employee's benefit accrual has been reduced for each year he

has aged, and this reduction violates ERISA § 204(b)(1)(H).

IBM's argument that this example merely illustrates the time value of money at work collapses when the age 65 annuity is included in the analysis. The rate of a participant's benefit accrual diminishes as the participant closes on the age 65 target. And, age 65 is normal retirement age, and Congress did not intend the term "benefit accrual" to mean something different from "accrued benefit." The syntax differs ever so slightly so as to comport with the requirements of good English usage, but the concept is exactly the same.

ERISA does not require an employer to provide a pension plan at all, nor does it favor one type of plan over another. The question is not whether a CBF is a "good" thing. IBM could have accomplished what it has to date by terminating the defined benefit plan and moving to a defined contribution plan According to IBM, this was impractical as the Plan surplus could not have been "tax effectively" withdrawn; but, the point stands. There is nothing in ERISA to prevent IBM from moving to a defined contribution plan that functions like the CBF. There may be policy reasons why Congress should specifically authorize CBFs in the context of defined benefit plans. But the narrow question here is whether the 1999 Plan comports with the literal and unambiguous provisions of ERISA § 204(b)(1)(H), and it does not.

In short, IBM's argument goes to the wisdom of the statutory requirements that Congress adopted regarding defined benefit plans. These requirements were in effect before IBM considered adopting the CBF. IBM, like many other corporate plan sponsors, proceeded with open eyes and was fully informed of the consequences of the litigation that was sure to come. This Court will not perform legal legerdemain by dodging the detail requirements of ERISA in order to save IBM's 1999 Plan.

Plaintiffs' cross motion for summary judgment regarding the CBF adopted by the IBM Plan by an amendment effective July 1, 1999 (Doc. 124) is granted. IBM's cross motion for summary judgment on Plaintiffs' age discrimination claim (Doc. 105) is denied.

## B. *Partial Termination*

Defendants' motion for summary judgment on the issue of partial termination is denied because there is a genuine question of material fact (1) whether the July 1, 1999, amendment to the Plan resulted in a decrease in future benefit accruals, and (2) whether any such decrease increased the potential for a reversion. The effects of the subsequent amendment to the Plan which was adopted October 1, 1999, as IBM argues, may make the measurement of the effects of the change unreliable, but this itself constitutes a disputed material fact.

## IV. *Conclusion*

Accordingly, Plaintiffs' motion for partial summary judgment on Count I (Doc. 87) is **GRANTED**. Defendants' motion to dismiss for lack of standing (Doc. 103) is **DENIED**. Defendants' motion for summary judgment on the age discrimination claim (Doc. 105) is **DENIED**. Defendants' motion for summary judgment on the § 204(b)(1)(G) claim (Doc. 107) is **DENIED**. Plaintiffs' motion for summary judgment on the cash balance formula (Doc. 124) is **GRANTED**. Plaintiffs' motion for summary judgment on the opening account balance under the cash balance formula (Doc. 127) is **GRANTED**. Defendants' motion for summary judgment on the anti-backloading claim (Doc. 128) is **DENIED**. Defendants' motion for summary judgment regarding the pension credit formula (Doc. 130) is **DENIED**. Defendants' motion for summary judgment regarding partial termination is **DENIED**.

Plaintiffs' appeal of the Magistrate's November 1, 2002, Order granting in part and denying in part the motion to compel discovery (Doc. 152) is **DENIED as moot** with leave to reinstate.

There is a triable issue of fact regarding Plaintiffs' anti-backloading claim as well as the partial termination claim. The parties will promptly proceed to develop the issue of what relief the Court should order.

**IT IS SO ORDERED.**

## APPENDIX A

The following motions are before the Court:

(1) Plaintiffs' motion for partial summary judgment on Count I (Doc. 87);

(2) Defendants' motion to dismiss Plaintiffs' § 204(b)(1)(H) claim for lack of standing (Doc. 103);

(3) Defendants' motion for partial summary judgment on Plaintiffs' age discrimination claim (Doc. 105);

(4) Defendants' motion for summary judgment on Plaintiffs' § 204(b)(1)(G) claim (Doc. 107);

(5) Plaintiffs' cross motion for partial summary judgment on Plaintiffs' age discrimination claim with respect to Cash Balance Formula (Doc. 124);

(6) Plaintiffs' motion for partial summary judgment on Count I—comparison formula for opening balances under 1999 cash balance formula (Doc. 127);

(7) Defendants' motion for summary judgment on anti-backloading claim (Doc. 128);

(8) Defendants' motion for summary judgment on Plaintiffs' § 204(b)(1)(H) claim with respect to pension credit formula (Doc. 130);

(9) Defendants' motion for summary judgment on Plaintiffs' horizontal partial termination claim (Doc. 133), and

(10) Plaintiffs' appeal of the Magistrate's November 1, 2002, Order granting in part and denying in part the motion to compel discovery (Doc. 152).

## APPENDIX B

| Age in Each Year Worked | Base Points Earned Each Year | Excess Points Earned Each Year |
|---|---|---|
| Younger than 30 | 7 | 0 |
| 30–34 | 9 | 1 |
| 35–39 | 12 | 2 |
| 40–44 | 15 | 2 |
| 45 and Older | 16 | 3 |

## APPENDIX C

| Age at Termination | Benefit Conversion Factors |
|---|---|
| 40 | 5.498 |
| 41 | 5.773 |
| 42 | 6.062 |
| 43 | 6.365 |
| 44 | 6.683 |
| 45 | 7.017 |
| 46 | 7.298 |
| 47 | 7.590 |
| 48 | 7.893 |
| 49 | 8.209 |
| 50 | 8.537 |
| 51 | 8.879 |
| 52 | 9.234 |
| 53 | 9.603 |
| 54 | 9.987 |
| 55 | 10.387 |
| 56 | 10.439 |
| 57 | 10.491 |
| 58 | 10.543 |
| 59 | 10.596 |

| | |
|---|---|
| 60 | 10.649 |
| 61 | 10.702 |
| 62 | 10.756 |
| 63 | 10.810 |
| 64 | 10.864 |
| 65 | 10.918 |